# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FRED C. ROBERTS,<br><br>  Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>  Defendant. | 8:17CV315<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on the Motion for Summary Judgment, ECF No. 35, filed by Defendant Union Pacific Railroad Company. For the reasons stated below, the Motion will be granted, in part.

## BACKGROUND

Plaintiff Fred Roberts was a locomotive engineer for Union Pacific. On December 22, 2013, Union Pacific assigned Roberts and Terry Booth, a conductor, to deliver a train located in North Platte, Nebraska, to Cheyenne, Wyoming. Before departure, Roberts and Booth had to perform a switching maneuver where certain cars were to be removed from the train and others were to be added. Roberts and Booth successfully removed two separate sets of cars from the train before attempting to add a set of cars.

The train consisted of three locomotives and several cars. Roberts was positioned in the front locomotive controlling the locomotives' movements and Booth was positioned outside of the rear locomotive providing Roberts with directions—point protection—by hand and radio. To add the set of cars, Roberts had to reverse the locomotives in an eastern direction into the cars with Booth's direction and guidance. Roberts and Booth began the move using hand signals, but when the locomotives traveled around a curve

in the tracks their line of sight was obstructed and Booth switched to the radio. Roberts and Booth exchanged the following radio communications as they travelled the curve:

> Booth: I'll give you six cars east back to hands around the curve.
>
> Roberts: Six. Back to hands around the curve.
>
> . . .
>
> Booth: Now three.
>
> Booth: Now one. Go ahead and ease it up.

Roberts Decl., ECF No. 41-19, Page ID 416. Seconds after Booth's last radio communication, the rear-most locomotive collided with the first car at an excessive speed between six and eight miles per hour, which resulted in a "hard coupling." Roberts Dep., ECF No. 41-1, Page ID 337, 100:1-14. Booth jumped off the locomotive before it collided with the train car.

According to Roberts, Booth's initial communication was misleading, and Roberts understood it to mean that after six train-car lengths Roberts and Booth would resume using hand signals, not that after six car lengths the rear-most locomotive would meet the first car for coupling. Roberts believed the first car was further down the track.

John Brown, the manager of terminal operations, was working nearby, heard the collision, and drove to the scene. When he arrived, Brown asked Roberts if he was physically injured, and Roberts told Brown that he was experiencing neck pain. Brown offered to call an ambulance, but Roberts did not believe an ambulance was necessary and declined. Brown then told Roberts he could choose to do one of three things: (1) finish switching the cars and go home, (2) allow a Union Pacific nurse to examine his neck injury, which would require no "paperwork," (3) or request transportation to a hospital

for an examination, which would include "paperwork" and "repercussions." Roberts Statement, ECF No. 41-3, Page ID 342; Roberts Dep., ECF No. 41-1, Page ID 335, 91:20-92:8. Roberts requested transportation to a hospital, and Brown agreed to take him. Brown also called Craig Cox, the manager of operating practices, to download the information from the event data recorders on the locomotives, which Cox did.

On their way to the hospital, Brown asked Roberts if, instead of going to the hospital, he would agree to get evaluated by a Union Pacific nurse. Roberts agreed to see a Union Pacific nurse if he could choose the nurse. When Roberts learned that the nurse he chose was not available, he asked Brown to transport him to a hospital. Brown then took Roberts to the Great Plains Regional Hospital emergency room in North Platte. When they arrived in the parking lot, Roberts was on Brown's cell phone with Jay Penner, the director of road operations, and, according to Roberts, Penner told Roberts that there would be "ramifications" in the form of "paperwork" if he went to the emergency room. Roberts Dep., ECF No. 41-1, Page ID 337, 97:19-98:3. Penner denies that he told Roberts there would be ramifications for going to the emergency room. Ultimately, Roberts went in to the emergency room to have his neck examined.

Cox investigated the cause of the incident by downloading the event data records and the track information records from one of the locomotives. He also obtained a recording of the radio communications between Roberts and Booth. On December 30, 2013, Union Pacific sent Roberts and Booth Notice of Investigation letters, which charged them with failing to "properly control a shove movement, control speed and conduct a proper job briefing regarding your move." ECF Nos. 37-7 & 37-8. Each letter identified David Howard, the manager of operating practices, as the "Charging Manager" and

3

proposed discipline at level 4C. *Id.* On December 30, Howard also sent Roberts and Booth notices that their respective certifications were revoked effective December 23, 2013, until January 22, 2014. ECF No. 41-14; ECF No. 37-10.

Union Pacific held an investigation hearing on January 20, 2014. After considering the evidence presented at the hearing, Tony Orr, the general superintendent, sustained the charges against Roberts and Booth and separately informed them of his decision in letters titled Notification of Discipline Assessed, dated January 28, 2014. ECF Nos. 37-9; 41-17. Although Orr found that Roberts and Booth both "failed to properly control a shove movement, control speed and conduct a proper job briefing . . . [,]" he found Roberts in violation of Rule 6.5 and Rule 70.3 of Union Pacific's General Code of Operating Rules (GCOR) but found Booth in violation of only Rule 70.3. *Id.* GCOR 6.5 provides the manner in which employees must execute a shove movement, ECF No. 41-15, and GCOR 70.3 provides the manner in which employees are to conduct a job briefing before executing such a movement, ECF No. 37-4, Page ID 165-66. Based on his findings, Orr assessed Roberts discipline at level 4C and assessed Booth discipline at level 3 under the "UPGRADE Progressive Discipline Table." *Id.* As a result, Orr suspended Roberts for sixty days and suspended Booth for five days. *Id.*; ECF No. 37-10. When Orr made his decision on January 28, 2014, both Roberts's and Booth's certifications had been reinstated. ECF No. 41-14; ECF No. 37-10.

Following Orr's decision, Randy Eardensohn, the director of regional operations, separately reviewed the evidence of the incident to determine whether Booth's certification was correctly revoked under 49 C.F.R. § 242.403, which provides the criteria

4

railroad carriers may consider when deciding whether to revoke a conductor's certification. Eardensohn agreed with Orr's findings.

In January 2014, Roberts took medical leave and never returned to work because he was unable to pass Union Pacific's fitness-for-duty evaluation.

On August 25, 2017, Roberts filed the Complaint, ECF No. 1, which asserted two separate "Claims for Relief" against Union Pacific under the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101 *et seq.*[1] Roberts's First Claim for Relief alleges Union Pacific denied, delayed, or interfered with medical treatment for his neck injury; threatened him with discipline if he sought medical treatment for his injury; and disciplined him more harshly than Booth because Roberts notified Union Pacific of his injury and sought medical treatment for that injury. *Id.* ¶¶ 23-28, Page ID 5; 49 U.S.C. §§ 20109(a)(4) & (c). Roberts's Second Claim for Relief alleges Union Pacific found him unfit to return to work following his medical leave because he reported and sought medical attention for his neck injury. Compl. ¶¶ 30-35, ECF No. 1, Page ID 6. Union Pacific moved for summary judgment on all claims arguing Roberts failed to support his claims with sufficient evidence.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods*

---

[1] Roberts may obtain *de novo* review of his claims under the FRSA in federal district court after exhausting administrative remedies. 49 U.S.C. § 20109(d)(3). Union Pacific does not argue that Roberts failed to exhaust his administrative remedies and it appears the Court has jurisdiction over his claims under 49 U.S.C. § 20109(d)(3). Compl. ¶¶ 19, 20, 22, ECF No. 1, Page ID 4-5.

*Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action."[2] *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

---

[2] Citing *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999), *abrogated by Torgerson*, 643 F.3d at 1043, Roberts argues the Court "'must be particularly deferential to the party opposing summary judgment' when liability depends on inferences rather than direct evidence[,]" such as in employment discrimination cases. Roberts Br., ECF No. 40, Page ID 308 (quoting *id*.). In *Torgerson*, however, the Eighth Circuit stated that the "particularly deferential" standard of review that Roberts advocates for is "unauthorized and should not be followed." 643 F.3d at 1043 (citing *Bell*, 186 F.3d 1099 (8th Cir. 1999) with disapproval). The standard of review for summary judgment motions is no different in employment discrimination cases, and Roberts is not entitled to a more deferential standard.

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

In his response brief, Roberts "waive[d] his claim of retaliation based upon Union Pacific's fitness for duty determination." Roberts Br., ECF No. 40, Page ID 306. The Court will, therefore, dismiss Roberts's Second Claim for Relief, with prejudice.

7

Under his First Claim for Relief, Roberts alleges Union Pacific denied, delayed, or interfered with medical treatment for his on-the-job neck injury, Compl. ¶ 24, ECF No. 1, Page ID 5; threatened discipline for seeking medical treatment, *id.* ¶ 25; and disciplined him more harshly than Booth because he notified Union Pacific of his neck injury and sought medical treatment for that injury, *i.e.* Union Pacific unlawfully retaliated against him, *id.* ¶ 27-28.

The FRSA provides, in relevant part:

**(a) In general.**--A railroad carrier engaged in interstate [ ] commerce . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done--

. . .

(4) to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee.

. . .

**(c) Prompt medical attention.**--

(1) Prohibition.--A railroad carrier or person covered under this section may not deny, delay, or interfere with the medical or first aid treatment of an employee who is injured during the course of employment. If transportation to a hospital is requested by an employee who is injured during the course of employment, the railroad shall promptly arrange to have the injured employee transported to the nearest hospital where the employee can receive safe and appropriate medical care.

(2) Discipline.-- A railroad carrier or person covered under this section may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician . . . . [F]or purposes of this paragraph, the term 'discipline' means to bring charges against a person in a disciplinary proceeding, suspend, terminate, place on probation, or make note of reprimand on an employee's record.

42 U.S.C. § 20109(a)(4) & (c).

I.   **Retaliation**

A claim for retaliation under the FRSA is analyzed in two steps. *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 857 (8th Cir. 2018) (citing *Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1112 (8th Cir. 2017), *rev'd on other grounds* 2019 WL 1005830 (March 4, 2019)). "First, the plaintiff must make a *prima facie* case." *Id.* "If the plaintiff establishes a *prima facie* case, 'the railroad has the opportunity to demonstrate by clear and convincing evidence that it would have [imposed the same adverse action against] the employee even if he had not engaged in protected activity.'" *Id.* (quoting *Loos*, 865 F.3d at 1112).

To establish a prima facie case, Roberts must show "(i) he engaged in a protected activity; (ii) [Union Pacific] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Hess*, 898 F.3d at 857 (quoting *Heim v. BNSF Ry. Co.*, 849 F.3d 723, 726 (8th Cir. 2017)).[3]

Union Pacific argues Roberts failed to provide evidence of circumstances which raise an inference that his protected activity was a contributing factor in an adverse action. This contributing-factor "standard is 'more lenient' than other causation standards." *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 722 (8th Cir. 2017) (quoting *Kuduk v. BNSF*

---

[3] The Court will analyze Roberts's claim for retaliation under 42 U.S.C. § 20109(a) and § 20109(c)(2) using the same two-step framework and prima facie elements. *See Bjornson v. Soo Line R.R. Co.*, 237 F. Supp. 3d 889, 893 (D. Minn. 2017) (citing *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014)).

*Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014)). "A contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Id.* (quoting *Kuduk*, 768 F.3d at 791). "[T]he contributing factor that an employee must prove is *intentional retaliation* prompted by the employee engaging in protected activity." *Blackorby*, 849 F.3d at 721 (quoting *Kuduk*, 768 F.3d at 791) (emphasis in *Blackorby*).

> To determine whether the circumstances raise an inference of retaliatory motive in the absence of direct evidence, we consider circumstantial evidence such as the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge. [T]he court also takes "into account the evidence of the employer's nonretaliatory reasons."

*Loos*, 865 F.3d at 1112-13 (quoting *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017)).

Howard, the charging manager, proposed disciplining Roberts and Booth at the same level, 4C, in their Notice of Investigation letters, ECF Nos. 37-7, 37-8, and their certifications were revoked for the same amount of time, ECF Nos. 37-10, 41-14. After reviewing the evidence presented at the investigation hearing, Orr sustained the charges against Roberts and Booth but decided to discipline Roberts more harshly than Booth. Thus, the Court must determine whether Roberts submitted sufficient evidence to raise an inference that his protected activity—notifying Union Pacific of his injury and seeking medical treatment—prompted Orr to retaliate against Roberts by disciplining him more harshly than Booth. *Gunderson*, 850 F.3d at 969 ("To avoid summary judgment on this element, [the employee] must submit sufficient evidence of 'intentional retaliaton

10

prompted by the employee engaging in protected activity.'") (quoting *Kuduk*, 768 F.3d at 791).

Approximately twelve hours after the incident, Penner sent several individuals, including Orr, an email making them aware of the incident and that Roberts requested and received medical treatment for an injury. ECF No. 41-5. Acknowledging that temporal proximity, alone, is not sufficient to create an inference of retaliatory intent, Roberts first argues that the temporal proximity of Penner's email to the incident is, nevertheless, particularly important in this case because, in his email, Penner recommended disciplining Roberts. Pl.'s Br., ECF No. 40, Page ID 313. However, Penner did not recommend any kind of discipline in his email, let alone any disparate discipline with respect to Roberts. Penner stated "*[b]oth* Roberts and Booth were drug tested because of a possible rule violation[;]" that "Brown will be the charging officer[;]"[4] and that "[t]entatively" GCORs 6.5, 70.3, and 6.28 were "in play." *Id.* (emphasis added); *see also* Penner Dep., ECF No. 41-4, Page ID 351, 18:21-19:2 (testifying that the email provided that both Roberts and Booth were to be charged with potential rule violations). The retaliatory act which Roberts complains of—disparate punishment—did not occur until January 28, 2014, over a month after the incident. Thus, although the email demonstrates that Orr knew Roberts sought medical treatment, neither the content of the email nor its temporal proximity to the incident raises an inference that intentional retaliation contributed to Orr's disciplinary decision.

---

[4] Ultimately, Howard was the charging officer. ECF Nos. 37-7, 37-8.

Roberts also relies on Penner's and Brown's comments about the repercussions, ramifications, and paperwork, that would result from seeking medical treatment at a hospital, which Roberts perceived as threats. *Loos*, 865 F.3d at 1112 (explaining that antagonism and hostility toward protected activity constitute circumstantial evidence of intentional retaliation). Roberts further relies on his belief that Brown called Cox to investigate the incident only after Roberts notified Brown of an injury. Yet evidence of Penner's and Brown's hostility or antagonism toward Roberts's protected activity does not show that intentional retaliation was a contributing factor in Orr's disciplinary decision, and Roberts has not shown that Penner or Brown were involved in, or influenced, that decision. *Gunderson*, 850 F.3d at 970 (finding the plaintiff failed to present evidence that individuals hostile toward protected activity influenced the ultimate adverse decision).

Finally, Roberts argues that Orr's disparate treatment of Roberts and Booth supports an inference of intentional retaliation. *Id.* (considering whether evidence of disparate treatment supported an inference of intentional retaliation). Orr issued Roberts a sixty-day suspension for violating GCOR 6.5 and 70.3 and issued Booth a five-day suspension for violating GCOR 70.3. Orr's reason for the disparity was that Roberts was "more accountable because of the fact that he's operating a locomotive." Orr Dep., ECF No. 41-16, Page ID 410, 21:22-23.

In *Kuduk*, the Eighth Circuit found it "particularly significant at the summary judgment stage that [the FRSA plaintiff's] protected activity . . . was completely unrelated to the [ ] incident that led to his discharge." 768 F.3d at 792; *see also Gunderson*, 768 F.3d at 969 (finding it "highly relevant" that the "disciplinary investigations that led to [ ] discharge were completely unrelated to protected activity"); *Loos*, 865 F.3d at 1113

12

(finding "the violation was unrelated to any protected activity")  Given this circumstance, the court then explained that "federal courts do not sit as a super-personnel department that re-examines an employer's disciplinary decisions."  *Kuduk*, 768 F.3d at 792.  Thus, "[i]n the absence of evidence connecting [a plaintiff's] protected activity to the [adverse action], [he] is not entitled to FRSA anti-retaliation relief even if [the railroad carrier] inaccurately concluded that he committed [a rule violation]."  *Id.* (citing *Allen v. City of Pocahontas*, 340 F.3d 551, 558 n.6 (8th Cir. 2003)).

In this case, Roberts's protected activity arose from, and is closely related to, the same incident that led to the investigation and Orr's subsequent disciplinary decision.  *Loos*, 865 F.3d at 1113 (stating "we consider . . . the relation between the discipline and the protected activity").  Thus, the Court must examine Orr's disciplinary decision, not to review the merit of the discipline, but to determine whether there are circumstances which raise an inference that Roberts's protected activity was a contributing factor in Orr's decision to discipline Roberts more harshly than Booth.  *See Kuduk*, 768 F.3d at 792; *Gunderson*, 850 F.3d at 969 ("declin[ing] to review the merits of the discipline").

Roberts provided evidence that Booth's initial radio communication—"I'll give you six cars east back to hands around the curve"—may have been misleading under the circumstances.  Eardensohn Dep., ECF No. 41-7, Page ID 363, 16:18-20.  Yet Orr held Roberts more accountable than Booth for the incident, and while holding an engineer more accountable than a conductor is a valid non-retaliatory basis for Orr's disparate disciplinary decision, the evidence sufficiently raises an inference that Roberts's protected activity contributed, at least in part, to Orr's disciplinary decision.

As noted above, where a plaintiff establishes a prima facie case of retaliation under the FRSA, the defendant may, nevertheless, be entitled to summary judgment if the defendant shows by clear and convincing evidence that it would have imposed the same discipline even if the plaintiff had not engaged in protected activity. *Kuduk*, 768 F.3d at 792 (citing 49 U.S.C. § 42121(b)(2)(B)(ii)). Union Pacific made no attempt to establish this affirmative defense. Accordingly, Union Pacific is not entitled to summary judgment on Roberts's retaliation claim under the FRSA.

## II. Denying, Delaying, or Interfering with Medical Treatment

In *Port Auth. Trans-Hudson Corp. v. U.S. Dep't of Labor*, the Third Circuit noted that it was the first federal court of appeals to consider a case involving 49 U.S.C. § 20109(c) and provided the following background:

> Before the FRSA was amended by the Rail Safety Improvement Act of 2008 ("RSIA"),[ ] [Pub. L. No. 110-432, 122 Stat. 4848 (2008),] 49 U.S.C. § 20109 was exclusively an anti-retaliation provision. Subsections (a) and (b) of § 20109 provided (and still provide) protections to employees who . . . notify a railroad or the Secretary of Transportation about 'work-related' injuries or illnesses . . . . The RSIA inserted a new subsection (c), *containing both an anti-retaliation provision, subsection (c)(2), and a more direct worker safety provision, subsection (c)(1)*[.]

776 F.3d 157, 161-62 (3d Cir. 2015) (emphasis added). The Third Circuit recognized that some federal courts have concluded employees may enforce subsection (c)(1) under subsection (d). *Id.* at 165 & n.12 (citing *Delgado v. Union Pac. R.R. Co.*, No. 12 C 2596, 2012 WL 4854588, at *4 (N.D. Ill Oct. 11, 2012) ("Section 20109 provides a private right of enforcement to an employee . . . who alleges that a railroad carrier violated the provisions of subsection (c)(1) by denying, delaying, or interfering with the medical or first

14

aid treatment of an employee injured during the course of employment.")));[5] *but see Metro-North Commuter R.R. Co. v. U.S. Dep't of Labor*, 886 F.3d 97, 107 (2d Cir. 2018) (questioning, without deciding, whether subsection (c)(1) provides an employee a private right of enforcement under subsection (d)).

Assuming, without deciding, that §§ 20109(c)(1) and (d) provide Roberts with a private right of enforcement, the evidence in the record does not sufficiently support such a claim. After Brown arrived at the collision, he promptly asked Roberts if he needed an ambulance and Roberts declined. According to Roberts, Brown then proposed three options, one of which was to request transportation to a hospital. Roberts chose that option, and Brown took Roberts to a hospital where he had his neck examined without interference. Thus, there is no evidence that Union Pacific denied, or interfered with, medical treatment.

Nor is there evidence that Union Pacific delayed medical treatment. On their way to the hospital, Brown repeatedly asked Roberts if he would agree to see a Union Pacific nurse instead of going to the hospital. Roberts agreed on the condition that he be allowed to see the nurse of his choice, and Brown began driving toward Union Pacific's yard office. At some point before they arrived, Roberts learned the nurse he chose was not available and asked Brown to take him to the hospital. Roberts promptly complied. Thus, absent Roberts's consent to see his nurse of choice, no delay would have occurred. The Court finds these facts are insufficient to support Roberts's claim that Union Pacific unlawfully denied, delayed, or interfered with medical treatment.

---

[5] *See also Blackorby v. BNSF Ry. Co.*, No. 13-CV-00908-FJG, 2015 WL 58601, at *4 (W.D. Mo. Jan. 5, 2015) (evaluating plaintiff's claim under subsection (c)(1)).

The Court will, therefore, dismiss Roberts's claim under 49 U.S.C. § 20109(c)(1), with prejudice.

## III.　Threatening Discipline

Section 20109(c)(2) prohibits Union Pacific from disciplining, or threatening to discipline, an employee for requesting medical treatment. According to Roberts, Brown told him that if he requested transportation to a hospital, there would be "paperwork" and "repercussions." Roberts Statement, ECF No. 41-3; Roberts Dep., ECF No. 41-1, Page ID 337, 97:19-98:3. Roberts also testified that Penner told him there would be "ramifications" in the form of "paperwork" if he went to the emergency room. *Id.* Brown and Penner denied that they ever threatened Roberts with discipline or attempted to intimidate him.

Union Pacific did not address this claim in its motion brief and has, therefore, not met its burden of demonstrating it is entitled to summary judgment.

## CONCLUSION

Roberts may proceed on his claim that Union Pacific violated 49 U.S.C § 20109(c)(2) by threatening discipline for requesting medical treatment and on his claim that Union Pacific violated 49 U.S.C. §§ 20109(a)(4), (c)(2) by retaliating against him for engaging in protected activity.

IT IS ORDERED:

The Motion for Summary Judgment, ECF No. 35, filed by Defendant Union Pacific Railroad Company, is granted, in part, as follows:

a.　Plaintiff Fred Roberts's Second Claim for Relief is dismissed, with prejudice;

16

b.  Plaintiff Fred Roberts's claim under 49 U.S.C. § 20109(c)(1) for denying, delaying, or interfering with medical treatment is dismissed, with prejudice; and

The Motion is otherwise denied.

Dated this 15th day of March 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge